UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ULYSSES PRYOR, | ) | |
|       Plaintiff, | ) | |
| v. | ) | No. 07 C 2479 |
| | ) | |
| CITY OF CHICAGO, a municipal | ) | Judge Rebecca R. Pallmeyer |
| corporation; EDWARD MCGOVERN, | ) | |
| as a Chicago Police Officer and as an | ) | |
| individual; TODD REYKJALIN, | ) | |
| as a Chicago Police Officer and as an | ) | |
| individual, | ) | |
| | ) | |
|       Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ulysses Pryor alleges that he was wrongfully detained and injured by Defendants, Chicago Police Officers Edward McGovern and Todd Reykjalin. For the purposes of their motion for summary judgment, Defendants do not dispute that Pryor had a run-in with police. Instead, Defendants seek summary judgment because, they contend, Pryor has failed to produce sufficient evidence that McGovern and Reykjalin are the officers involved in the incident. For the reasons stated herein, Defendants' summary judgment motion is denied without prejudice to renewal if Defendants are unable to depose Attorney Joan Sorensen.

## BACKGROUND

**I.     The Incident**

Plaintiff Ulysses Pryor alleges that he was stopped near his home by two Chicago Police officers, slammed against the officers' car, searched, and detained for several minutes without cause. Several divergent accounts of the incident are in the record before the court. Where the facts are contested, the court credits Plaintiff's version of events and construes the record in the light most favorable to Plaintiff, the nonmoving party. *Payne v. Pauly*, 337 F.3d 767, 770 (7th Cir. 2003).

### A. Plaintiff's Account

Pryor lives near the intersection of Adams Street and Kilbourn Avenue on the west side of Chicago, Illinois. (Pl's 56.1 Resp. ¶ ¶ 1,4.) On the evening of March 27, 2006, between 5:30 p.m. and 6:30 p.m., Pryor received a telephone call from his neighbor, Hector Negron. (*Id.* at ¶ 4-5.) Pryor agreed to meet Negron, who lived some six houses down the block, in an alley near his home to continue the conversation in person. (Pryor Dep. 2/10/09 at 27-29.) Approximately 15 minutes after he hung up, Pryor exited the back door of his house and entered the alley. (*Id.* at 30.) As Pryor walked eastward down the alley toward Kilbourn Avenue, a car headed north on Kilbourn abruptly stopped and blocked the mouth of the alley. (*Id.*) Pryor described the vehicle as a blue and white marked police car with a blue stripe down the side. (*Id.* at 31.) When Pryor reached the end of the alley, where the car stood, he asked the two officers seated in the vehicle if there was anything he could do for them. (*Id.* at 32.) When the officers did not respond, Pryor attempted to walk around the car. (*Id.*) As he did so, the officers jumped out of the car, and the driver seized Pryor's arm and twisted it behind his back, throwing Pryor against the car. (Id. at 32-33.)

After throwing Pryor against the police car and slamming the right side of Pryor's face against the vehicle, the driver handcuffed Pryor, removed the contents of his pockets, and placed him in the back seat of the car. (*Id.* at 64-66.) Pryor asked the grounds for his arrest, to which the officer replied, "Shut the fuck up." (*Id.* at 66.) Pryor claims he saw the driver type his name, which the officer read from an identification card taken from Pryor's wallet, into the car's computer. (*Id.* at 67.) The driver informed Pryor that he was "doing a drug trafficking stop" and asked whether Pryor had any outstanding warrants. (*Id.* at 68.) The officer who had been a passenger in the squad car remained outside the car during this time. After five minutes, the driver pulled Pryor from the car, removed the handcuffs, and the two officers sped away without any further explanation. (*Id.* at 71-73.) The contents of Pryor's pockets—his wallet, keys, loose papers, etc.—had been left on the rear of the police car, and they scattered as the car drove off. (*Id.* at 73.) Pryor gathered

his belongings and went home without talking to Negron. Forty-five minutes later, Pryor went to the hospital with shoulder pain, the result, he believes, of injuries he sustained when the officer seized and twisted his arm. (*Id.* at 82.) A police sergeant on duty at the hospital that night attempted to question Pryor about the incident, but Pryor refused to talk with the sergeant. (*Id.* at 86.)

In his first deposition, Pryor described the officer who grabbed him, the driver, as a white male, approximately 5'10" in height and weighing between 150 and 190 lbs. (*Id.* at 50, 51.) Pryor recalled that the driver had stubble "all over his face" like a "twelve o'clock shadow." (Id. at 48.) He further testified that he believed the driver wore a skullcap on his head, but he admitted that he was uncertain about that. (*Id.* at 47.) Pryor admitted, further, that although he was face-to-face with the driver, he could not provide any more detailed description of the officer. (*Id.* at 35-36.) Pryor described the officer in the passenger seat as a white male who "could have been" 6'0" or 6'1" in height and who weighed between 180 and 250 lbs. (*Id.* at 50.)

Beyond the apparent race and size of the men, all Pryor could say for sure about the officers was that they were wearing dark-colored clothing and shoes, either blue or black. (*Id.* at 52.) Pryor did not remember whether the officers were wearing plain clothes or uniforms. (*Id.* at 47.) He could not recall seeing a vest, a badge, or a name tag on the officers. (*Id.* at 47, 34.) Pryor could not remember whether either officer wore eyeglasses, and he did not recall either man's hair or eye color. (*Id.* at 47-49; 51-52.) Pryor testified that it was dark outside, and he had never seen the two officers before. (*Id.* at 32, 116.) The court takes judicial notice that, according to the National Oceanic and Atmospheric Administration, sunset occurred at approximately 6:11 p.m. in the Chicago area on March 27, 2006.[1]

Before filing this lawsuit, Pryor did not know the names, badge numbers, or any other identifying characteristics of the officers. (*Id.* at 52-53.) He testified initially that he did not know

---

[1] NOAA Sunset Calculator, http://www.seeb.noaa.gov/highlights/sunrise/sunrise.html (last visited Jan. 27, 2010).

how his previous attorney had identified Officers Edward McGovern and Todd Reykjalin as the policemen who stopped him that night. (*Id.*) Then, after a break in deposition questioning and a conference with his attorney, Pryor remembered that, immediately after the incident, he had written down a four-digit number that appeared "on top of the car, the black plate that the police have on the top of their car with a four digit number." (*Id.* at 54, 58.) Prior testified that he had turned that number over to his former attorney, "Lawson Jersey," but that he no longer remembered the number he had written down. (*Id.* at 58-59.) When pressed, Pryor said: "Like I said, I am not sure [of the number]. I want to say 1123. I don't know why that hits my brain so much. 1123, but I'm not sure." (*Id.* at 132-133.)

At a second deposition, Pryor was shown two photo arrays that included photographs of Defendants Reykjalin and McGovern in plain clothes. Pryor was unable to pick out or identify either of the officers who stopped him. (Pryor Dep. 9/10/09 at 6-7.) Pryor stated: "No I couldn't identify [them] for the reason that I only see a face. I don't have a whole body. They had a uniform on, so to me they look totally different with clothes on. I would need them to look the same as they did that night with the uniform." (*Id.* at 6.)

### B. Raynard Holloway's Account

Raynard Holloway testified that he witnessed the incident in the alleyway on March 27, 2006. Holloway has known Pryor for five or six years and is married to Pryor's first cousin. (Holloway Dep. 11.) Holloway stated that he was in the vicinity at the time of the incident because Hector Negron, Pryor's neighbor, was doing some work on Holloway's car. (*Id.* at 14.) Holloway recalled that the incident occurred between noon and 3:00 p.m., in daylight. (*Id.* at 26.) Holloway was near Negron's garage when he saw Pryor exit his house and cross the alley toward Negron's yard. (*Id.* at 26-27.) Holloway testified that he was standing on the sidewalk with Hector Negron when the police pulled up. (*Id.* at 27-28.)

According to Holloway, a standard blue and white Chicago police car pulled up to Pryor and stopped at the mouth of the alley. (*Id.* at 27, 30.) Two officers exited the car and started "harassing" Pryor. (*Id.* at 27.) Holloway called out to the officers and asked what they were doing. (*Id.* at 28.) According to Holloway, the officers told him to "mind my business." (*Id.*) The police car, the officers, and Pryor were "at least 15 feet" away from Holloway, and Holloway could not recall any distinguishing markings or numbers on the car. (*Id.* at 27, 30.) When asked to describe the officers, Holloway said, "Well, the only thing I know is white officers, with their uniforms. I don't know exactly." (*Id.* at 30-31.) Holloway believed both officers were stocky; he estimated that each officer weighed roughly 215 lbs and was between 5'10" and 6 feet in height. (*Id.* at 34.) Holloway recalled that both officers were wearing police uniforms, which Holloway described as navy pants, vests, and leather jackets. (*Id.* at 31-34.) Holloway couldn't say what color hair the officers had, could not distinguish between the two of them, and doubts that he would be able to identify either officer if he saw them again. (*Id.* at 35.) He has no further knowledge of the identity of either officer. (*Id.* at 55.)

    **C.**    **Hector Negron's Account**

Hector Negron was Pryor's neighbor at the time of the incident. (Negron Dep. at 7.) Negron is a mechanic. He met Pryor, whom he referred to by Pryor's nickname, "June," in 2007, when Pryor started coming to Negron for advice and maintenance on his car. (*Id.* at 10.) According to Negron, at some time between 5:00 p.m. and 6:00 p.m. on March 27, 2006, he was on his back porch when he saw Pryor exiting a car across the street. (*Id.* at 16-17.) Negron testified that he beckoned to Pryor with a hand gesture. (*Id.* at 17-18.) According to Negron, he and Pryor were walking toward each other and were roughly 15 feet apart, when two plain-clothes police officers pulled up in a dark grey, unmarked, four-door "regular detective car." (*Id.* at 52.) Negron recognized the model of the car as a Crown Victoria. (*Id.* at 52.)

Both officers exited the car. According to Negron, the driver "grabbed [Pryor] . . . and was

5

just shaking him back and forth, I don't know, for no reason . . . Then they just throw him in the car." (*Id.* at 22-23.) During this time, Negron advanced to within five feet of the officers, but the driver yelled at Negron to "stay back," and Negron did not interfere. (*Id.* at 21-22; 32-33; 49-51.) Negron said he saw the officers pat Pryor down, but he did not see them remove anything from Pryor's pockets. (*Id.* at 25.) The officers then placed Pryor in the car, and "just drove off with him." (*Id.*) According to Negron, he did not see anyone else in the area and he believes there were no other witnesses. (*Id.* at 25-26.) Negron said Holloway was not present with him while he was watching the incident. (*Id.* at 53.)

Negron described the driver as about six feet tall and weighing 200 lbs. (*Id.* at 27-28.) The other officer was 5'9" in height and weighed "a little bit more than 200 [lbs]." (*Id.*) The driver had light brown hair and was balding slightly. (*Id.* at 28.) He had a long face with a long nose, "and he was white, real white." (*Id.* at 28-29.) The passenger, also white, was "chubby" and bald, with a round face. (*Id.* at 29, 60.) According to Negron, neither officer was in uniform; both were wearing blue jeans and black vests. (*Id.* at 31.) Negron testified that he had not seen either officer since the incident, but he believed he could identify the officers if he saw them again. (*Id.* at 34-35; *Id.* at 51.) The record does not indicate that Negron was ever shown a photo array or otherwise asked to identify Defendants.

## II. The Defendants

Defendants Officer Edward McGovern and Officer Todd Reykjalin are partners on the Chicago police force. The City of Chicago is also a Defendant, under a *respondeat superior* theory of liability as to Pryor's state claims. Reykjalin estimates his height at 6'0" and testified that he weighed between 200 and 215 lbs in March 2006. (Reykjalin Dep. at 6-7.) McGovern estimates his height at 6'0" and testified that he weighed a little less than 230 lbs in March 2006. (McGovern Dep. 6.) Both officers testified that on March 27, 2006, they were assigned to Beat 1114 in Chicago's 11th Police District. (McGovern Dep. at 6-7; Reykjalin Dep. at 6-7.) McGovern stated

6

that the beat number, 1114, was displayed on top of their marked patrol car on a clearly-visible black plate with white numbers. (McGovern Aff. ¶ 2.) The officers worked from 4:00 p.m. to 12:30 p.m. They deny having had any contact with Ulysses Pryor on March 27, 2006. (McGovern Dep at 6; Reykjalin Dep. at 7; Def. Interrogatory Ans. No. 8, 16, 19.) They deny stopping Pryor or running his name though the police computer system. (Reykjalin Aff. at ¶ 9; McGovern Aff. at ¶ 9.)

According to both Reykjalin and McGovern, they were in full uniform on March 27, 2006. That uniform consisted of a powder blue shirt, navy pants, and "vest covers."[2] (Reykjalin Aff. at ¶ 3-7; McGovern Aff. at ¶ 5-7.) The officers stated that they did not wear coats that day and that they did not own leather jackets in March 2006. (*Id.*) Both officers stated that they always display their name tags and stars (badges) outside of their vests when working in uniform. (McGovern Aff. at ¶¶ 3-5; Rykjalin Aff. at ¶¶ 3-6.) Both officers stated that they always shave before work, and that they do not have heavy beards. (McGovern Aff. at ¶ 4; Reykjalin Aff. at ¶ 5.)

### III. Police Records

Attached to the memorandum in support of their motion for summary judgment, Defendants submitted the affidavit of Cindy Herzberger, the Principal Systems Programmer for the Chicago Police Department. (Herzberger Aff. ¶ 1.) In her position, Herzberger is responsible for generating reports by extracting data from the Chicago Police Department's computer systems. (*Id.* at ¶ 2.) Herzberger's search of those records reveals that Ulysses Pryor's name was not run against any database by a mobile computer terminal located in a police car or any fixed or land-based terminal on March 27, 2006. (*Id.* at ¶ 3.) The records show that neither Officer Edward McGovern nor Officer Todd Reykjalin ran any names that day using the unique personal computer identification number assigned to each officer. (*Id.* at ¶ 5.) Herzberger's search did reveal, however, that on

---

[2] The court assumes that "vest cover" is a reference to the black or dark blue protective vests commonly worn by Chicago Police officers.

March 27 at 10:28 p.m., Pryor's mugshot was accessed by Officer Candance Milovich (the court assumes this may be the officer who attempted to question Pryor at the hospital). (*Id.* at ¶ 4.)

Defendants also submitted the affidavit of Laura Dunaj, a Police Communications Operator with the City's Office of Emergency Management and Communications. (Dunaj Aff. ¶ 1-3.) In connection with this case, Dunaj analyzed "Event" and "Unit" queries of electronic logs maintained by the City to document a police unit's activities and communications. (*Id.* at ¶ 6-9.) According to those records, at 5:18 p.m. on March 27, 2006, McGovern and Reykjalin were assisting another police unit with a separate incident near the 4300 block of W. Cortez Ave. (*Id.* at ¶ 11; Event Query, Ex. A; Unit Query, Ex. B.) The queries also show that at 6:18 p.m., McGovern and Reykjalin's unit transported a person to Mount Sinai hospital for non-criminal mental health reasons. (*Id.* at ¶ 13.) According to the logs, the officers reported that they had finished assisting the transport at 6:48 p.m. (*Id.* at ¶15.) The 4300 block of W. Cortez is roughly two miles north of Pryor's home. Mount Sinai Hospital is roughly 3.5 miles southeast of Pryor's home.

McGovern and Reykjalin state in nearly identical affidavits that they "have no reason to believe" that the police records are inaccurate and that, "based [on the records]," they were involved in assisting a call near 4300 W. Cortez and a transport to Mt. Sinai Hospital. (McGovern Aff. at ¶¶ 13-19; Reykjalin Aff. at ¶¶ 13-18.)[3] Plaintiff objects to Defendants' reliance on the logs and disputes their accuracy. (Pl.'s 56.1 Resp. ¶¶ 60-66.) Plaintiff seeks to strike the affidavits of McGovern, Reykjalin, Dunaj, and Herzberger; the Event and Unit queries; and Defendants' statements of fact that cite to those materials. (Pl's Mot., D.E. 81.)

---

[3] A fair reading of the officers' statements indicates that both officers lack any independent recollection of what they were doing on the evening of March 27, 2006.

### IV.     Attorney Sorensen's Identification of Defendants

As stated, Pryor testified that he wrote down a four-digit number that appeared on the squad car and turned that number over to his former attorney, whom Pryor identified as "Lawson Jersey." The attorney then used means unknown to Pryor to determine that McGovern and Reykjalin were the proper Defendants. When Pryor's initial complaint was filed in March 2007, his attorney was Robert Lunz, a partner at the law firm of Lunz & Jersey.[4] (Notice of Removal, D.E. 1, Ex A.) Lunz withdrew in May 2008 and was replaced by Attorney Ed Fox, who is not associated with the Lunz firm. (Minute Entries, D.E. 39; D.E. 41.)

In March 2009, Plaintiff filed a motion to reconsider this court's order directing Plaintiff to view a photo array in order to identify the officers involved in the incident. (Motion to Reconsider, D.E. 58.) Footnote 1, which appears on the third page of that motion, reads as follows:

> To meet its burden, if identity became an issue, Plaintiff would make use of the letter, attached as exhibit A, and attorneys Joan Sorensen and Joe Dombrowski who had roles in this issue. As a result, Plaintiff would respectfully incorporate this document and these persons into Plaintiff's Rule 26(a)(1) disclosures.

(*Id.*) Attached as Exhibit A is a letter, dated May 19, 2006 and addressed to "Ms. Sorensen" from Olivia Medina, a Public Information Officer for the Chicago Police Department. (Motion, D.E. 58 at Ex. A.) Medina's letter was a response to a Freedom of Information Act (FOIA) request in which Sorensen had sought the identity of the officers "assigned to car #9674 on March 27, 2006 at approximately 6:15 p.m. at the location of 4508 W. Adams." (*Id.*) In response, Officer Medina wrote that the city had determined that Officer Edward McGovern and Officer Todd Reykjalin were assigned to car #9674 in the 11th District at that time. (*Id.*)

Based on the disclosure of the letter and Sorensen's name, defense counsel Patricia Kendall sought to contact Sorensen. (Kendall Aff. at ¶ 3-5.) In June 2009, while discovery was

---

[4]     It is unclear from the record whether "Lawson Jersey" is an attorney at the firm, whether Pryor misspoke, or whether the reporter simply erred in transcribing Pryor's testimony.

ongoing, Kendall called the law office of "Dombrowski and Sorensen" and was informed that Sorensen had retired from the firm. (*Id.* at ¶ 5-7.) Kendall spoke with attorney Joe Dombrowski, who refused to provide a forwarding address for Sorensen other than "General Delivery—Cayman Islands." (*Id.* at ¶ 7.) Kendall then contacted Ed Fox and warned that Defendants would object to Sorensen's being called as a witness unless Plaintiff could provide Defendants with Sorensen's contact information. (*Id.* at ¶ 9.) Kendall also sent Fox a letter, a copy of which is in the record, memorializing their conversation. (*Id.* at ¶ 11; Ex D to Pl's Mot. to Strike.) Fox has never provided Defendants with Sorensen's contact information. (*Id.* at ¶ 12.)

A declaration that purports to be that of Sorensen is nevertheless attached to Plaintiff's Statement of Additional Facts, and Plaintiff relies on that declaration to oppose summary judgment. (Pl's 56.1 Stat, Ex B.) The declaration bears Sorensen's signature, but it is undated, is not notarized, and bears no indication that it was sworn or signed before a witness. (*Id.*) The declaration states that in March 2006, Pryor met with Sorensen at her law office for an initial consultation, and "indicated that he saw police car #9674 in the alley at 4508 W. Adams on March 27, 2006 at approximately 6:15 p.m." (Sorensen Decl. at ¶ 2-4.) Attached to the declaration is a copy of Sorensen's FOIA request and the Police Department's response letter. (*Id.* at Ex. A-B.)

To explain how he obtained Sorensen's declaration, Ed Fox submitted his own affidavit in which he explains that he too contacted Joe Dombrowski in an effort to locate Sorensen. (Fox Aff. at ¶ 4.) Dombrowski told Fox that Sorensen was retired but that Dombrowski continued to be contact with her. (*Id.* at ¶ 5.) Dombrowski supplied Fox with Sorensen's file notes from her meeting with Pryor and agreed to present Sorensen with a declaration that Fox prepared. (*Id.* at ¶ 6.) Fox prepared the declaration based on the notes provided by Dombrowski, the FOIA request, and the city's response letter. (*Id.* at ¶ 6-7.) Fox then sent the unsigned declaration with a cover letter to Dombrowski; copies of both the letter and the unsigned declaration are in the record. (*Id.* at ¶ 7-8; *Id.* at Ex. A.) Fox apparently never notified Defendants of his arrangements with Dombrowski or

10

the existence of Sorensen's declaration prior to responding to Defendants' summary judgment motion. Defendants move to strike Joan Sorensen's declaration, the FOIA request and response, and Plaintiff's statements of fact that rely on these materials.

The court now turns to its consideration of the parties' motions to strike and to Defendants' motion for summary judgment.

## **DISCUSSION**

### I. **Summary Judgment Standard**

A motion for summary judgment shall be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(c). When ruling on a summary judgment motion, the evidence presented by the nonmoving party must be believed and all justifiable inferences are drawn in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 255 (1986); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). The court does not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence on summary judgment. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). The function of summary judgment is not to determine the truth of the matters presented in a case, but, instead, to determine whether there is a genuine issue for trial and "to isolate and dispose of factually unsupported claims." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); *Hemswoth*, 476 F.3d at 490.

### II. **Motion to Strike Defendants' Statement**

Both sides have moved to strike portions of their opponents' submissions. The court turns first to Plaintiff's motion to strike Defendants' Rule 56.1 statement and supporting materials for non-compliance with the local rules. Local Rule 56.1 requires that a party seeking summary judgment submit a brief statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law. U.S.DIST.CT.RULES N.D. ILL.

R. 56.1(a). The statement of facts should include specific references to the affidavits and other materials supporting the motion. *Id.* Ensuring compliance with the local rules serves an important function in organizing the evidence and identifying the disputed facts. *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005). The court has discretion in determining how to enforce the local rules and whether to apply them strictly or to overlook a party's transgression. *Id.* Affidavits and other evidence presented at the summary judgment stage must be of a kind that would be admissible at trial. *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 849 (7th Cir. 1992).

Plaintiff first contends that several paragraphs in Defendants' statement of facts mischaracterize evidence and testimony and state facts that are insufficiently supported by the record. The court disagrees. After reviewing the materials before it, the court finds that the Defendants accurately characterize the facts and testimony and properly cite the record in their 56.1 statement. The deponents in this case have made a variety of inconsistent statements. For example, initially, Pryor testified that he had no idea how his attorney identified Officers Edward McGovern and Todd Reykjalin as the men who stopped him. Minutes later, after a break, Pryor testified that he did remember writing down a number from the squad car and turning it over to counsel. Not surprisingly, Defendants focused their arguments on Pryor's initial statement and other facts that were most advantageous to their motion. This is the nature of advocacy; it is not cause to strike Defendants' statement of facts.

Next, Plaintiff moves to strike all of Defendants' references to the Event and Unit queries and police computer records because, Plaintiff contends, these documents are irrelevant, have not been properly authenticated, and constitute "hearsay within hearsay." (Pl's Mot. at 3.) The relevance objection bears little discussion; documents and statements objected to by Plaintiff are clearly probative of a central dispute in the case, that is, whether Officer McGovern and Reykjalin were harassing Plaintiff in an alleyway on March 27, 2006, or whether the officers were two or three

miles away responding to a different call.

Plaintiff's hearsay and authentication objections fare no better. Both the affidavits of Herzberger and Dunaj purport to be based on the personal knowledge of the affiants, professionals who compile, maintain, and consult police records. (Herberger Aff. ¶ 1-2; Dunaj Aff. ¶ 1-5.) The affidavits satisfy the court that computer and query records are made at the time of the event they record, in the course of regularly conducted police activity, and as a matter of regular practice. (Herberger Aff. ¶ 3-6; Dunaj Aff. ¶ 6-9.) The records therefore fall under the hearsay exception for regularly conducted business activities, FED. R. EVID. 803 (6), and extrinsic evidence of authenticity is not required as a condition precedent to their admissibility. FED. R. EVID. 902 (11). The computer and query logs also appear to satisfy the public records exception to hearsay, as they reflect the activities of a public office. FED. R. EVID. 803 (8). Accordingly, Plaintiff's objections based on relevance, authentication, and hearsay are overruled.

Plaintiff next objects to all of the affidavits offered by Defendants because, according to Plaintiff, "they are inadmissable self-serving affidavits which contradict earlier deposition testimony." (Pl's Mot. at 4.) Obviously, the fact that an affidavit is self-serving does not render it improper. "All affidavits are 'self-serving' insofar as they serve the interests of the party submitting them." *Heller v. Graf*, 488 F.Supp.2d 686, 690 (N.D. Ill. 2007). Instead, the rule is that parties may not thwart the purposes of procedural rules by submitting affidavits that create sham issues or contradict their own depositions prior to summary judgment. *See, e.g., Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102, 1104 (7th Cir. 1985). Plaintiff makes no attempt to point to any specific contradictions or discrepancies between Defendants' affidavits and testimony, however, and after reviewing the record, the court cannot identify any contradictions. Defendants are entitled to clarify earlier deposition testimony with consistent affidavits. *Id.* at 1104-05. That appears to be what Defendants are doing in this case.

Plaintiff's motion to strike Defendants' statement of facts, affidavits, and exhibits is denied.

### III.     Motion to Strike Sorensen Declaration

Defendants object to the declaration of Joan Sorensen and seek to strike Plaintiff's statement of additional facts because, they contend, Sorensen was not properly disclosed as a potential witness under FED.R.CIV.P. 26. The discovery rules require that each party reveal to the other side "the name and, if known, the address and telephone number of each individual likely to have discoverable information." FED.R.CIV.P. 26(a). A party also has a general duty to supplement and correct its disclosures when additional information becomes available. FED.R.CIV.P. 26(e). When information has "otherwise been made known to the other parties during the discovery process," however, a party is not obligated to supplement its disclosures. FED.R.CIV.P.26(e)(1)(A); *see also David v. Caterpillar, Inc.*, 324 F.3d 851, 856 (7th Cir. 2003).

Defendants rightly criticize the unorthodox manner in which Sorensen's name was disclosed—in a footnote to Plaintiff's March 2009 motion to reconsider—but there is no dispute that Plaintiff did, in fact, make Sorensen known as a possible source of information. There is also no dispute that Defendants read and understood the disclosure of Sorensen's name when it was made. The FOIA response letter, which was appended to the motion rather than tucked away in a footnote, leaves little doubt as to the subject of Sorensen's knowledge in this case. It makes clear that Sorensen requested information as to the identities of the police officers who were driving car #9674 at the time and location that Plaintiff claims to have been accosted by police. Sorensen is also identified in the footnote as an attorney with knowledge on the issue of the officers' identity, and Pryor had previously testified that he wrote down a four-digit number that appeared on the police car involved in the incident and handed it over to an attorney. Taken as a whole, this information put Defendants on notice that Sorensen had received information from Pryor and had knowledge as to how McGovern and Reykjalin were identified. *See Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 732 (7th Cir 2004).

While discovery was still ongoing, Defendants sought out Sorensen by contacting the law

14

office where she had been a partner. According to Plaintiff's lawyer, Ed Fox, the only means Plaintiff had for contacting Sorensen was through her former law office, and Fox himself never learned Sorensen's personal street address, phone number or other contact information. Both parties, then, equally relied on Sorensen's former law partner, Joe Dombrowski, for contact with Sorensen. Plaintiff has no information that he withheld from Defendants; from the record it appears that Mr. Fox disclosed all that he knew when he provided Sorensen's name and the name of her law office. Defendants were aware of Sorensen's identity, and the subjects of Sorensen's knowledge in the case. They had an opportunity to attempt to locate Sorensen before discovery closed, just as Plaintiff did. In his inexplicable refusal to provide additional information, Dombrowski was not acting as Plaintiff's agent or under his instructions. This record does not support the conclusion that the declaration should be stricken as a penalty for *Plaintiff's* failure to cooperate.

The form of the declaration itself is nevertheless unsatisfying. First, the circumstances surrounding its production are suspicious. Acting apparently on his own initiative, Dombrowski appears to have deliberately impeded Defendants' efforts to contact Sorensen. Dombrowski later agreed to relay Plaintiff's prepared declaration to Sorensen in September 2009, but Plaintiff's counsel evidently chose not to advise Defendant about this indirect contact–not a technical violation of Rule 26, but nevertheless disappointing. And there are obvious concerns about the reliability of Sorensen's unsworn and unwitnessed declaration. On its face, the declaration does not comply with the requirements of 28 U.S.C § 1746, which requires that an unsworn declaration be subscribed as true "under penalty of perjury," signed, and dated. *See Trapaga v. Central States Joint Board Local 10*, No. 05 C 5742, 2007 WL 1017855 *2 (N.D. Ill. March 30, 2007). Sorensen's declaration is signed and subscribed under penalty of perjury, but it bears no date. Nor has any party to this case ever met, questioned, or dealt directly with Sorensen in obtaining her declaration. Fox admits to writing Sorensen's declaration himself, based partially on information and unsworn hearsay statements of Dombrowski, a non-witness who, Defendants point out, has had his law

15

license suspended three times, twice in incidents involving the unauthorized signing of another's name. *See, e.g., In re Dombrowski*, 71 Ill.2d 445, 451, 367 N.E.2d 1001, 1010 (1978) (Dombrowski signed settlement agreement on behalf of a client without authorization and against her instructions). These circumstances raise questions about the credibility of Dombrowski's statements and the authenticity of Sorensen's declaration.

While the court declines at this stage to strike Sorensen's declaration, Defendants are entitled to probe these questions more deeply. Defendants' motion to strike is denied, but the court will reopen discovery for the purpose of deposing Sorensen. Sorensen may well be beyond the court's subpoena power, but Plaintiff will have an interest in assisting Defendants in locating her because, should she fail to appear in person, the information in her declaration will be inadmissable and the court will revisit its summary judgment decision. The court suggests, further, that the parties depose Joe Dombrowski regarding his role in obtaining Sorensen's declaration.

## IV. Defendants' Summary Judgment Motion

Defendants have asked the court to enter summary judgment, urging that Plaintiff has failed to present a triable issue of fact. Whether Officers McGovern and Reykjalin are the persons who stopped Plaintiff on March 27, 2006 is solely a factual issue. The lone question is whether Plaintiff has produced sufficient evidence to survive summary judgment on his assertion that that these Defendants were in fact involved. With some reservations, the court concludes that he has.

Plaintiff has produced circumstantial evidence that, when viewed in the light most favorable to him, supports his allegations. Pryor testified that, after he was accosted and injured by two police officers, he wrote down a number that appeared on the marked police car involved in the incident. He then turned that number over to an attorney, who filed a FOIA request on his behalf. The Chicago Police Department's official response to that request stated that Officer Edward McGovern and Officer Todd Reykjalin were assigned to the car bearing that number on the night and in the area in question. McGovern and Reykjalin loosely fit the description of the officers

provided by Plaintiff and other witnesses. Both are Caucasian, both are roughly six feet tall and each weighed slightly more than 200 pounds at the time of the incident. Both were wearing dark clothing—navy blue uniform pants and vests—as Plaintiff described. They were riding in a marked squad car, as Plaintiff described. The officers note that there is no record that they accessed computer files concerning Plaintiff and that there are records showing that they were responding to a different call at the relevant time. They admit, however, that they were on patrol near the area where the incident occurred around the time in question. These circumstantial facts are enough that some reasonable trier of fact might conclude that Officers McGovern and Reykjalin are the officers who stopped and injured Pryor.

Defendants challenge this conclusion, noting discrepancies in Pryor's account. Pryor testified that the number that he wrote down was a "beat number" and believed, at the time of his deposition that it could have been 1123, but he admitted that he had since forgotten the number and that he was no longer sure what it was. He recalled seeing the number on a black plate on the car. Pryor now contends, supported by Sorensen's declaration, that the number he wrote down was the car number, #9674. According to Defendants, the number of a marked police vehicle does not appear on any black plate, but is painted directly on the car itself.

The court suspects that many unfamiliar civilians would be unable to distinguish between a four-digit beat number and a four-digit car number as they appear on a police vehicle. Pryor stated that he read the number from a black "plate," but it is possible that he read it from an adjacent place on the car. Though Pryor thought the number might have been 1123, he admitted that he was uncertain. The court concludes that Pryor's identification is more than "mere speculation." *Caldwell v. City of Chicago*, No. 08 C 3067, 2009 WL 2391221, *4 (N.D. Ill. July 31, 2009) (plaintiff in a wrongful arrest case who wrote down a partial license plate number of that defendant's police car had shown there was a genuine issue of material fact as to officer's identity). officers' identities.

17

Nor do the remaining weaknesses in Pryor's case defeat his claim as a matter of law. Plaintiff's recollection of events is spotty, his witnesses gave contradictory accounts, and Defendants have potential alibi evidence. Those matters go to the weight and credibility of the evidence, which are matters for a jury to consider. Pryor unequivocally testified—and the court must credit his testimony—that (1) he wrote down a number that he read on the police car, (2) he turned the number over to his lawyer, and (3) he no longer remembered what the number was. Those statements are not contradicted by Pryor's current contentions opposing summary judgment or by Sorensen's declaration. However disappointing the circumstances surrounding the production of that declaration may be, the court is unable at this stage to conclude the declaration is being used to create a sham issue. Rather, the declaration plausibly fills a gap in Pryor's testimony, and explains how Pryor determined the identity of the officers based on a four-digit number he had written down. The limited additional discovery on the issue that the court orders today will adequately permit Defendants to assess and respond to this claim.. The motion for summary judgment is denied.

## **CONCLUSION**

Defendants' motion for summary judgment [71, 75] is denied without prejudice. Plaintiff's motion to strike [81] is denied. Defendants' motion to strike [84] is denied. The court will permit the limited reopening of discovery to allow Defendants to subpoena and depose Sorensen and Dombrowski. Plaintiff is expected to assist Defendants in locating Sorensen for this purpose. Should Sorensen fail to surface, evidence concerning her investigation will be barred.

ENTER:

Dated: February 1, 2010

_____
REBECCA R. PALLMEYER
United States District Judge