**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ULYSSES PRYOR, | ) |
|         Plaintiff, | ) |
|         v. | ) No. 07 C 2479 |
| CITY OF CHICAGO, a municipal corporation; EDWARD MCGOVERN, as a Chicago Police Officer and as an individual; TODD REYKJALIN, as a Chicago Police Officer and as an individual, | ) Judge Rebecca R. Pallmeyer |
|         Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

In this lawsuit, brought pursuant to 42 U.S.C. § 1983, Plaintiff Ulysses Pryor contends that he was assaulted and detained without cause by two unidentified Chicago Police officers. Despite extended discovery, however, Pryor has not produced evidence that links the two police officers named as Defendants in this case with the events in question. Pryor himself cannot recall any distinguishing characteristics of the officers who stopped him; he was unable to identify Defendants in photographic arrays; and police records indicate that Defendants were responding to another call at the time the incident occurred. The only potential piece of evidence that explained how the two Defendant officers even came to be named in this lawsuit—a declaration attributed to retired attorney Joan Sorensen—was stricken from the record after Ms. Sorensen testified that she had no personal knowledge of the case and no recollection of having seen or signed the declaration. *See Pryor v. City of Chicago*, ___ F. Supp.2d ___, No. 07 C 2479, 2010 WL 2698305 (ND. Ill. July 7, 2010). In the wake of that revelation, Defendants renewed their motion for summary judgment. For the reasons explained below, the motion is granted.

## BACKGROUND

**I.     The Incident**

The court has summarized the facts of this case at length in two earlier opinions, including its order initially denying Defendants' motion for summary judgment. *See Pryor v. City of Chicago*, No. 07 C 2570, 2010 WL 431470 (N.D. Ill. Feb. 1, 2010). As explained earlier, Pryor alleges that, sometime between the hours 5:30 p.m. and 6:30 p.m. on the evening of March 27, 2006, he was stopped by two Chicago Police officers as he attempted to walk through an alley near his west side home. For no reason that Pryor could discern, the officers grabbed him, slammed him against their police car, and handcuffed his hands behind his back. The officers searched Pryor's pockets, put him in the back of their police car, and ran a computer check on his name. Pryor testified that he himself saw one of the officers enter his name into the computer. After detaining Pryor for roughly five minutes, the officers pulled him from of the car, removed the handcuffs, and sped away without offering any further explanation. Pryor believes that he sustained a shoulder injury during the encounter.

   **A.     Pryor's Attempts to Identify Defendants**

Following the event, Pryor could offer only the most general descriptions of the two officers involved: they were both Caucasian males. Pryor says that one of the officers, the driver, was about 5'10" in height and weighed between 150 and 190 pounds. He had stubble "all over his face" like a "twelve o'clock shadow." (Pryor Dep. at 48.) Although Pryor was face-to-face with this man, Pryor testified, he was unable to provide a more detailed description. The other officer, whom Pryor referred to as the "big guy," was between 6'0" or 6'1" in height and between 180 and 250 pounds in weight. (*Id.* at 50.) Beyond the apparent race and size of the men, all that Pryor could say for sure about the officers was that they were wearing dark-colored clothing and shoes. It was dark

2

outside, Pryor testified, and he had never seen the two officers before.[1] Pryor did not remember whether the officers were wearing plain clothes or uniforms and did not recall seeing a vest, a badge, or a name tag on either officer. He could not say whether either officer wore eyeglasses or what color either man's hair or eyes were. In short, Pryor could not recall any characteristics that distinguished either officer from other Caucasian males in the same broad size range.

Police Officers Edward McGovern and Todd Reykjalin are the individual officers named as Defendants in this action.[2] For purposes of this motion, Defendants do not dispute that Pryor was accosted by two police officers. They simply dispute whether *they* are those two officers. They deny having had any contact with Pryor on the evening of March 27, 2006, and in fact contend that they were responding to a call elsewhere in the city at the time that Pryor had his run-in with police. At his deposition, Pryor initially testified that he did not know how his attorneys had identified McGovern and Reykjalin as the two policemen who allegedly stopped him on the night in question. Then, after a break in deposition questioning and a conference with his attorney, Pryor remembered that, immediately after the incident, he had written down a four-digit number that appeared "on top of the car, the black plate that the police have on the top of their car with a four digit number." (*Id*. at 54, 58.) Pryor testified that he turned the four-digit number over to an attorney (who Pryor identified as Lawson Jersey), but he did not remember exactly what the number was. Pryor said he believed the number was 1123, but he was not sure. On the night of March 27, 2006, Officers McGovern and Reykjalin were assigned to a marked patrol car on Beat 1114 in Chicago's 11th Police District. The number 1114 was displayed on top of their marked car on a clearly-visible black

---

[1] The court has previously taken judicial notice that, according to the National Oceanic and Atmospheric Administration, sunset occurred at approximately 6:11 p.m. in the Chicago area on March 27, 2006. *See Pryor*, 2010 WL 431479 at *2.

[2] The City of Chicago ("the City") is also a Defendant, under a *respondeat superior* theory as to Pryor's state law claims. Pryor has not advanced any theory of liability against the City based on *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978).

3

plate with white numbers.

At a second deposition, Pryor was shown two photo arrays that included photographs of Defendants Reykjalin and McGovern in plain clothes. Pryor was unable to pick out or identify either man as one of the officers who stopped him. Pryor stated: "No I couldn't identify [them] for the reason that I only see a face. I don't have a whole body. They had a uniform on, so to me they look totally different with clothes on. I would need them to look the same as they did that night with the uniform." (Pryor Dep. Sept. 10, 2009 at 6-7.) This statement is somewhat inconsistent with Pryor's earlier testimony that he was unsure whether the officers were wearing uniforms. It is unclear whether Pryor was ever shown other photo arrays of police officers in uniform.

### B. Eyewitness Accounts

Two other witnesses claim to have observed the March 27 incident: Raynard Holloway and Hector Negron. Holloway is married to Pryor's first cousin and Negron is Pryor's friend and neighbor. Both witnesses testified that they happened to be in the area and saw the alleged events take place. Holloway testified that he and Negron were standing together on a sidewalk with a view of the alley when a standard blue and white Chicago police car pulled up and stopped where the alley met the street. According to Holloway, it was still daylight–he guessed the time was between noon and 3:30 p.m.—when he saw two officers exit the car and proceeded to "harass" Pryor. Holloway estimated that Pryor and the officers were about 15 feet away from him, and he claims that he called out and asked what the officers were doing. One of the officers told Holloway to "mind [his] business," Holloway testified, so he didn't interfere. (Holloway Dep. at 27). When asked to describe the two officers he had seen, Holloway said: "Well, the only thing I know is white officers, with their uniforms. I don't know exactly." (*Id.* at 30-31.) He testified further that he believed both officers to be stocky; he guessed that each weighed roughly 215 pounds and that each was between 5'10" and 6 feet in height. He also recalled that both officers were wearing police uniforms, which Holloway described as navy pants, vests, and leather police jackets.

4

Beyond these details, Holloway could not remember anything else about the officers and doubted that he would be able to identify them if he ever saw them again.

Negron testified that he too was present when the incident occurred, but he denies that Holloway was with him and he estimates that the incident actually took place between 5:00 p.m. and 6:00 p.m. According to Negron, he was on his back porch when he saw Pryor walking down the alley. As Pryor walked toward Negron, a dark grey, four-door sedan—not a marked squad car—pulled into the alley. Negron, who is an auto mechanic by trade, recognized the model of the car as a Crown Victoria and described the vehicle as a "regular detective car." (Negron Dep. at 52.) According to Negron, two men in plain clothes got out, threw Pryor into the backseat of the car, and "just drove off with him." (*Id.* at 25.) Of all the witnesses, Negron gave the most detailed description of the men who grabbed Pryor. He described the driver of the car as about 6'0" tall and weighing 200 lbs. He had light brown hair and was balding slightly. He also had a long face with a long nose, "and he was white, real white." (*Id.* at 28-29.) The other man, also white, was 5'9" in height and weighed "a little bit more than 200 [lbs]." (*Id.* At 27.) He was bald and "chubby," with a round face. Neither man was in police uniform, according to Negron; both were wearing blue jeans and black vests. Negron testified that he had not seen either man since the incident, but he believed he could identify them both. The record does not indicate whether Negron was ever shown a photo array or otherwise asked to identify Defendants.

### C. Defendants McGovern and Reykjalin

Officers McGovern and Reykjalin are partners on the Chicago Police Force. Reykjalin estimates his height at 6'0" and testified that he weighed between 200 and 215 lbs in March 2006. McGovern estimates his height at 6'0" and testified that he weighed a little less than 230 lbs in March 2006. On March 27, 2006, the officers worked the evening shift from 4:00 p.m. until 12:30 p.m. They were both in full uniform, consisting of a powder blue shirt, navy pants, and dark-colored protective vests. They did not wear coats. Both officers stated that they always display

5

their name tags and stars (badges) outside of their vests when working in uniform. Both officers also attest that they always shave before work, and do not have heavy beards.

Defendants deny ever coming into contact with Ulysses Pryor. To corroborate this denial, they have produced electronic records from the City's computer database showing that neither McGovern nor Reykjalin used their unique personal identification number to conduct a computer of search of Pryor's name on March 27. In fact, the records reflect that neither officer ran any names at all that day.[3] Defendants have also produced records from the City's "Event" and "Unit" queries—electronic logs that record a police unit's activities and communications. As part of their jobs, police officers on the beat regularly report their positions to police dispatchers. These reports are memorialized in query logs. According to those records, at 5:18 p.m. on March 27, 2006, McGovern and Reykjalin were assisting another police unit with an unrelated incident near the 4300 block of West Cortez Avenue. Then, at 6:18 p.m., McGovern and Reykjalin reported that they were assisting in the transport of a person to Mount Sinai hospital for non-criminal mental health reasons. They reported to their dispatcher that they finished with the transport at 6:48 p.m. The 4300 block of West Cortez is roughly two miles north of the alley where the Ulysses Pryor incident allegedly occurred, and Mount Sinai Hospital is roughly 3.5 miles southeast of the area. In short, according to the query logs, Defendants were occupied with other police matters from 5:18 p.m. until 6:48 p.m. on the night in question. McGovern and Reykjalin stated in nearly identical affidavits that they "have no reason to believe" that the police records are inaccurate and that, "based [on the

---

[3] A search of the Police Department's entire system revealed that Ulysses Pryor's name was not run against a police database by a mobile computer terminal located in any police car or at any fixed or land-based terminal on March 27, 2006–this, despite Pryor's testimony that he saw the unknown officer enter his name into the car's computer. Police records do show that, at 10:28 p.m. on March 27, Pryor's mugshot was accessed electronically by Officer Candance Milovich. On the evening of March 27, Pryor testified, he checked himself into a local hospital to seek treatment for the shoulder injury he sustained during the encounter. While he was at the hospital, a police officer Pryor had not seen before attempted to ask his some questions about the incident, but Pryor declined to speak with the officer. The court assumes that Milovich may be the officer who attempted to question Pryor at the hospital.

6

records]," they believe they were involved in assisting a call near 4300 West Cortez and a transport to Mt. Sinai Hospital during the relevant time period. As the court explained in its earlier opinion, "[a] fair reading of the officers' statements indicates that both officers lack an independent recollection of what they were doing on the evening of March 27, 2006." *Pryor*, 2010 WL 431470 at *5.

### D. Evidence of Identity

In September 2009, Defendants moved for summary judgment in this case, arguing that Pryor had produced no non-speculative evidence that McGovern and Reykjalin were in fact the officers who had assaulted him. In an effort to defeat that motion, Plaintiff produced the declaration of retired attorney Joan Sorensen. According to the declaration, Sorensen had consulted with Pryor about the case shortly after the incident. The declaration asserted that Sorensen was the attorney who identified Defendants by matching a four-digit number Pryor had given her with a car number from Defendants' patrol vehicle. As already stated, Pryor himself had testified that he viewed a four-digit number on the offending officer's patrol car, that he subsequently reported that number to an attorney, and that he no longer remembered what the number was. In light of Pryor's testimony, this court concluded, Sorensen's declaration provided the necessary link between Defendants and the events in question. Thus, viewing the evidence in light most favorable to Pryor, the court explained, Sorensen's declaration "was sufficient to raise an issue of material fact as to whether Defendants were the officers who stopped and injured Pryor." *Pryor*, 2010 WL 2698305 at *1.

Due to a number of suspicious circumstances surrounding the production of Sorensen's declaration, however, the court allowed Defendants to depose Sorensen to "probe the validity and authenticity" of her sworn statement. *Id.* at * 2. In her deposition, Sorensen testified that she had no recollection of ever meeting Pryor, knew nothing about the facts of his case, and could not recall having ever seen or signed the declaration attributed to her. *Id.* at *3 ("Rather than assuage the

7

court's concerns regarding the declaration, Sorensen's testimony has cast more doubt on the validity and authenticity of that document. . . . What is clear at this point is that Sorensen herself purports to have no personal knowledge of Pryor's case or his claimed identification of the car number on Defendants' patrol vehicle.") Sorensen also testified that several handwritten notes–which Plaintiff had represented to this court as Sorensen's contemporaneous notes from her initial meeting with Pryor–were actually not in her handwriting and contained information that was wholly unknown to her. Accordingly, the court struck Sorensen's declaration and notes from the record and granted Defendants leave to renew their motion for summary judgment. *Id.* at *4. The court now considers that renewed motion.

## **DISCUSSION**

A motion for summary judgment shall be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In applying this standard, disputed issues of fact are to be resolved in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). While the court draws reasonable inferences for the non-movant and refrains from weighing the evidence, *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir. 2005), summary judgment "does not require [a] court to stretch existing evidence to reach conclusions or bolster arguments it could not otherwise support." *Frost Nat. Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 868 (7th Cir. 2001). Plaintiff must do more than merely allege a factual dispute in order to defeat summary judgment. *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989). Rather, as to any issue on which he bears the ultimate burden of proof, Plaintiff is obliged to identify evidence that would permit a jury to find in his favor. *See Roberts v. Broski*, 186 F.3d 990, 995 (7th Cir. 1999) (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).

In this case, Pryor must prove by a preponderance of the evidence that *these* Defendants

are responsible for violating his constitutional rights. Section 1983 creates a cause of action based upon personal liability and predicated upon fault; an individual cannot be held liable in a §1983 action unless he personally caused or participated in the alleged constitutional deprivation. See *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998). Thus, to survive Defendants' motion for summary judgment, Pryor must produce something more than his own unsupported speculation that Defendants McGovern and Reykjalin are the officers who stopped and injured him. See *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993) ("'[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.'") (citing *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991)). He has not done so.

The Defendant officers have produced evidence, in the form of their own testimony and corroborating police records, that they were responding to another call at the time Pryor claims to have been assaulted. Defendants' contemporaneous reports to their dispatcher, memorialized in event and unit query logs, show that they were more than two miles away from the scene throughout the alleged incident. While, at this stage, the court would be required to credit any contrary evidence that Pryor could adduce, Pryor has advanced no proof that is sufficient to place Defendants' alibi in dispute. The lone piece of evidence that explains how these Defendants were named in this lawsuit at all—Sorensen's declaration—was stricken after further discovery exposed it as spurious. In its place, Pryor has failed to substitute any evidence that would raise a material question of fact.

Pryor's vague descriptions of the officers who stopped him on the night in question are so inconclusive and generic as to have no evidentiary value for identification purposes. During his deposition, Pryor remembered only that the offending officers were Caucasian, each was between 5'10" and 6'1" in height, and each weighed between 150 and 250 pounds. Plaintiff's brief characterizes Pryor's description of the offending officers as "remarkably similar" to the physical appearance of the Defendant officers, but the court finds nothing remarkable in Pryor's ambiguous

9

description. (Pl.'s Br. at 2.) Rather, in the court's view, Pryor's indeterminate sketch of the offending officers seems to aptly describe a substantial majority of the Chicago Police force.[4] Nor do the wide weight and height ranges estimated by Pryor narrow the class of potential suspects.[5]

Pryor was unable to identify Defendants in a photographic array, and he admitted that he could not recall any further distinguishing traits of the offending officers. The few specific details that Pryor was capable of remembering are inconsistent with the known attributes of McGovern and Reykjalin. For example, Pryor described one of the offending officers as having thick stubble, but both McGovern and Reykjalin attest that they always shave before work and do not have thick facial hair. Pryor testified that both of the offending officers were wearing completely dark clothing, but Defendants attest that they were both wearing powder blue uniform shirts on the evening in question. Lastly, while Pryor testified that he watched as one of the offending officers typed his name into their car's computer terminal, uncontested police records show that neither McGovern or Reykjalin ran any names through their car's computer that day. In sum, no reasonable trier of fact could conclude that Pryor's general and inconsistent descriptions conclusively implicate either Defendant McGovern or Reykjalin in the alleged wrongdoing.

---

[4] According to records maintained by the Department of Justice, as of the year 2000, 78 percent of Chicago police officers were male, and only 38.6 percent of officers identified themselves as either African-American or Hispanic. *See* Brian A. Reaves & Matthew Hickman, *Police Departments in Large Cities, 1990-2000,* DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT, NCJ 175703, Appx. Table B (May 2002), http://bjs.ojp.usdoj.gov/content/pub/pdf/pdlc00.pdf (last visited Sept. 15, 2010). As these statistics demonstrate, a substantial majority of Chicago Police officers are both Caucasian and male. *See also* Danielle Gordon, *Police Forces Trail Suburbs in Pace of Racial Change,* THE CHICAGO REPORTER., Feb. 1998 ("But the debate is nothing new to Chicago, where the battle over minority hiring and promotion has raged for years. In 1997 the city, which is about two-thirds minority, employed a 14,815-person police force that was nearly two-thirds white.")

[5] Moreover, as Defendants point out, Pryor characterized one of the offending officers as the "big guy" and estimated that he weighed as much as 250 pounds, potentially as much as 100 pounds more than his partner. McGovern and Reykjalin report that they are an identical 6'0" in height; McGovern weighed a little less than 230 lbs in March 2006 and his partner Reykjalin weighed between 200 and 215 lbs. The officers therefore do not display the large weight or height disparity that Pryor apparently observed in the offending officers.

The divergent testimony of Pryor's supporting witnesses does nothing to help his cause. The marked inconsistencies of their accounts aside, neither Holloway nor Negron is capable of providing the necessary identification of the offending officers. Like Pryor, Holloway could say only that the offending officers were Caucasian, and he doubted that he could identify either man if he ever saw them again. Indeed, the one specific detail that Holloway did provide—that both officers were wearing leather police jackets–is inconsistent with the known characteristics of Defendants, who attest that they were not wearing coats on the evening in question. By the same token, Negron, who provided the most detailed account of the incident by far, remembered details that simply cannot be squared with the known characteristics of McGovern and Reykjalin. Negron, a professional auto mechanic, described the offending officers' vehicle as a dark gray, unmarked Crown Victoria. It is undisputed that, on the night in question, Defendants were driving a marked blue and white patrol car. Negron further testified that the offending officers were wearing plain clothes, and it is uncontested that Defendants were in uniform on March 27, 2006. Negron also remembered specific details of the offending officers' facial features and testified that he thought he would be capable of identifying the officers if given the opportunity, but the record does not reflect that he was ever shown a photo array or otherwise asked to identify Defendants.

At this point, the clock has run out on Pryor's opportunity to identify Defendants. Summary judgment is the "'put up or shut up' moment in litigation." *Goodman v. National Sec. Agency, Inc.*, ___ F.3d ___, No. 09-2043, 2010 WL 3447727, at *2 (7th Cir. Sept. 3, 2010) (citing *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 476 (7th Cir.2010)). After more than two years of protracted litigation, neither Pryor nor his witnesses can identify the officers involved in the alleged deprivation of his rights, and Pryor can point to no proof of identity that is sufficient to warrant consideration at trial. *See Horton v. Wilson*, No. 00 C 6179, 2002 WL 31719596, at *5 (N.D. Ill. Dec. 4, 2002) (Hibbler, J.) ("Horton protests that he would be able to identify the officers in court, in order to sort out which officer participated in the allegedly unconstitutional arrest and detention. Horton's solution

is untimely and unfair. He has had over two years to take the depositions and use other discovery methods to identify the officers that arrested and detained him.") Because Pryor has not produced sufficient evidence that the named Defendants are the individuals who actually caused his alleged constitutional injury, Defendants are entitled to summary judgment. *See Moore v. City of Chicago*, No. 02 C 5130, 2007 WL 3037121 at *9 (N.D. Ill. Oct. 15, 2007) (Moran, J.) ("Without evidence of plaintiff's identification of [the defendant officer] as an officer from whom she requested medical care, or without any evidence that other jail personnel informed [the defendant officer] of plaintiff's requests, plaintiff does not raise a genuine issue of material fact that [defendant officer] was responsible for plaintiff's medical care, and thus, the officer is entitled to summary judgment . . .")

## CONCLUSION

Defendants' renewed motion for summary judgment [122] is granted.

ENTER:

Dated: September 15, 2010

_____
REBECCA R. PALLMEYER
United States District Judge